Peck, J.,
delivered the opinion of the court:
At the December term, A. D. 1867, of this court George E. Glenn filed his petition herein, by which he represented that he is now, and has been for three and more years last past, a paymaster in the United States Army, actively engaged in the payment of United States troops, and performing the usual duties of said office; that while in the performance of his official duties, your petitioner was on the 13th day of August, A. D. 1866, ordered to proceed from Fort Yancouver, Washington Territory, where he then was on duty, to the military district of Fort Boise, in the Territory of Idaho, and there pay all troops in that district; that said order emanated from your petitioner’s immediate chief, Colonel Simeon Francis, who was then stationed at Fort Yancouver aforesaid, and on duty as paymaster of the United States.
That in obedience to said order he did about the 20th day of August, 1866, proceed to Fort Boise aforesaid, where he arrived about the 28th day of August, 1866; that from said last date until about the 5th day of October, 1866, he was engaged in executing said order, and during that period paid out large sums of money.
*504 That on or about tbe 5th. day of October, 1866, having just returned from Camp Warner, Oregon, whither he had been to pay troops, his safe or box was taken, stolen, and carried away from Fort Boise aforesaid and from his possession while he was acting in the line of his duty, and without fault or neglect on his part.
■ He further avers, that at the time said safe was stolen from him it contained the sum of sixty-three thousand and seven dollars, and twelve cents, ($63,007 12,) moneys belonging to the United States, which were stolen from him as aforesaid while the same were lawfully and legitimately in his possession and custody.
That he instituted, immediately after the discovery of the theft, a thorough search and investigation in reference thereto, and succeeded, after expending much time and labor and at great personal sacrifice of his individual means, iu recovering thirty-seven thousand five hundred and fifty dollars and thirty cents of the money so stolen, but that the sum of twenty-five thousand four hundred and fifty-six dollars and eighty cents has never been recovered, and he stands charged with the same by the accounting officer of the Treasury Department.
Wherefore he prays that a decree may be made in his behalf so that he may be relieved from the consequences of the theft, and that he may be entitled to a credit in the settlement of his accounts for the money stolen.
We think he has made such a showing of the circumstances connected with the theft, and of his conduct before, at the time, and after the unfortunate occurrence as justifies the decree he asks by his petition. The loss does not appear to have been the result of fault or neglect on the part of the petitioner.
His conduct appears to have been such as would have been that of any other discreet person similarly situated, and does not show any want of prudence.
All cases like this must be examined and considered by the light of surrounding circumstances. What might be exacted from a disbursing officer as prudential should have regard to his situation, necessities, and condition. What might excuse the conduct of a party at one time or place, would not do so under another state of facts. What caution or wariness might require at some times would not be necessary at others. This claimant was at a fort in an unsettled country, in the company *505 only of such persons as he might well suppose would be influenced by interest and duty to protect the property which had been intrusted to him. He had no reason to suspect that the danger from theft was such as to require any more vigilance on his part than he actually exercised, and we do not believe that many men, however careful in the calculation of probabilities or possibilities, would have been more discreet previous to such an experience than he was.
In support of this view of the case we cite the opinion of one of the witnesses, also a paymaster acquainted with frontier life and the duties and obligations of his position. He says: “ On arriving at a government post I have always felt as if I was among friends, as if there was no danger to be apprehended. I have never had a guard, and never had my money under lock and key on such occasions.” ‘ ‘ On arriving at a post I have never considered it necessary to trouble myself much about it.” “Whenever I have paid the post at Fort Boise I think I have been out riding and walking every day I have been there, leaving my money in Major Marshall’s quarters without a single guard, and without charging any one to watch it or look out for it.” “Among paymasters there, it was never considered necessary to take any precautions as to the safety of funds at a post.”
“While on the road in traveling we apprehended a good deal of danger from Indians, and from road agents, as they were called, that is, highway robbers, and had to be constantly on the alert; but 1 never apprehended any danger from soldiers. I have left my own money, and have known every paymaster with whom I have been acquainted on the Pacific coast to do the same thing in the same way. Ihave done so in every government post I have paid on the Pacific coast. There is no way of having any protection for your money other than that, except to watch it yourself; and that is impossible where you are travelling ten months out of the twelve. When I am travelling, and have an escort, as is sometimes the case, I depend, of course, on the soldiers for protection; but I always dismissed my escort on arriving at a government post, and put them in charge of the commanding officer of the post, and they took their quarters with the other men.”
“I should say there was nothing unusual in his conduct; I think it was natural, and about as a person would do in nine *506 cases out of ten, under sucb circumstances. This is the first instance of a disbursing officer of the army having been robbed by soldiers that has come to my knowledge. The difficulties a soldier would have to encounter in accomplishing such a purpose would be so great as to make it extremely improbable that he would attempt it. In an isolated post of that kind he could not use any considerable amount of money without exciting suspicion. The only currency in use in that country is coin. He could not use his greenbacks there without converting them into coin, and he could not escape without going three hundred miles through an Indian country in one direction, or across the plaño s to the States in the other.”
We have copied from the testimony of this witness at considerable length, because he was a paymaster who had paid-troops at the post where claimant was robbed.
This witness is corroborated in the statements copied from his deposition, by Colonel Marshall, the commandant of the district in which Fort Boise was, and by other paymasters who were acquainted with the locality, the habits of business of such officers in that regard, and the hazards connected with it.
The law under which this court takes jurisdiction of cases like this presumes that disbursing officers may meet with losses without fault or neglect on their parts, and under circumstances which will excuse them from the unceasing exercise of the utmost possible vigilance, for with that it would rarely happen that a loss would occur. The utmost possible vigilance might require of an officer that he should keep his hand upon his treasure at all times — then loss of treasure would only happen with loss of life or overpowering force; but a person may be without fault or neglect, without the use of this abundant care or caution. The necessity for such vigilance is not always apparent before a loss, and its exercise may not always be compatible with possible convenience and present appliances. After a loss, excuses are listened to with reluctance; expedients which might have been resorted to for its prevention are suggested with readiness and in abundance, and indicate plainly that although prevention is preferable to remedies, yet human wisdom is never superior under all circumstances to the vices and accidents of life.
To require that disbursing officers shall be gifted with prescience, or endowed with power to use superhuman efforts, so *507 as always to avoid or prevent losses, would be to exact from mortals the exalted excellencies of superior beings. From the latter class, disbursing officers are rarely, if ever, appointed.
Major Glenn, while at Fort Vancouver, Washington Territory, received from his superior officer the following order:
“You will proceed, on or near the 20th of.the present month, to the military district of Fort Boise, and pay, to the 31st August, 1866, all the United States troops in that district, and also all Oregon cavalry and infantry volunteers, not under orders for muster out, and return to this station without delay.”
In obedience to it, he left with money in his hands somewhat exceeding one hundred thousand dollars; and before reaching Fort Boise he had paid, at intermediate stations, about forty thousand dollars; on arriving at Fort Boise he had in charge about $63,000. At Camp Smith claimant joined Colonel Marshall, the commanding officer at Fort Boise, who gives the following account of their meeting and journey to Fort Boise:
“ He joined me at Camp C. F. Smith, which is situated on White Horse creek, about one hundred and seventy miles from Fort Boise, and in my district. I was then on a scout. He paid the troops that were with me — three companies of cavalry. He paid a company of infantry at Camp O. F. Smith; and after-' wards, when we came to Camp Warner, he paid the troops there — one company of infantry. It took us about four days to come from Camp Warner to Camp C. F. Smith. We stayed there eight or ten days. My horses were broken down, and I had to recruit them as we went along. Then we were probably ten or twelve days more in getting to Fort Boise. This was prior to the robbery. I noticed, during all this time, that the petitioner was very careful of the box containing his funds. He always slept with it at his head, and never left it on any account. After getting through Malheur River canon — I suppose about one hundred miles from Fort Boise, having had nothing to eat for three days, except rose-buds and occasionally wild cimrants, as we could find them, the rations having given out — I said to the petitioner that I was going forward to the settlement to get something to eat, and invited him to accompany me. He said no, he would stay with the money-box. I told him the pack-master was very reliable, and would take care of it as well as he could. He said no, he would stay. This was early in the morning. I went on to breakfast, and about 2 *508 o’clock be came up. I then took fresh borses au cl rode all night, arriving at Fort Boise about 8 o’clock tbe next night. Tbe next clay I sent a post ambulance and. driver for tbe petitioner, who arrived at Fort Boise that night about dark, or just before dark.”
After arriving at Fort Boise tbe following statement of tbe conduct of Glenn, and tbe disposition of bis baggage, and tbe position of • men, and tbe occurrences there, is given by tbe same witness:
I was then standing in tbe door, and there were standing in front of tbe quarters Colonel St. Clair, Captain McGregor, Dr. Wagner, surgeon of tbe post, Captain Collins, and probably Captain Hinton. These are all tbe persons I recollect, except myself, who were standing there when tbe petitioner came up. He came up in tbe ambulance, got out, and tbe ambulance drove on to my quarters, and dumped tbe load right in front of tbe quarters. Tbe box containing tbe treasure and tbe baggage were thrown out together. Tbe petitioner talked there a few minutes and then walked off towards my quarters, and I did not see him any more until I went back to my quarters at nine o’clock that night. Then be came to me and asked if I bad •seen anything of tbe money box. I said no. We searched all around tbe quarters, and made up our minds that it bad been stolen. I went out and bad tbe rolls called, and every man absent arrested, but could make no discovery that night. Tbe sentinel’s beat at tbe guard-house was east and west. There was a guard on duty around tbe quartermaster’s quarters. • Captain Eckerson was captain and quartermaster. St. Clair’s quarters were on tbe same front line with those of tbe commanding officer, and a person standing in front would have a view of tbe whole line of officers’ quarters; and tbe sentinel at tbe guard-house would have tbe same view. This sentinel’s duty was to give warning if anybody approached tbe guard-house, and to see that nobody but officers and those who bad tbe right to visit tbe quarters of tbe commanding officer approached there at night, and to send for tbe corporal of tbe guard if any one came. We then come to tbe quartermaster’s and commissary’s depot; there is a sentinel there whose duty it is to guard tbe quartermaster’s stores. His beat was all around tbe quarters. He also bad a view of tbe officers’ quarters when he was on tbe south side of bis beat. There was also a senti *509 nel at tbe stables, to guard tbe stables, and see that no one wbo bad no right in tbe post entered; to challenge everybody on tbe road approaching tbe barracks. This was on tbe line of tbe quartermaster’s and commissary’s depot — perhaps one hundred yards distant — and this road was tbe regular approach to tbe barracks.
Q. State whether baggage left, as this was, for temporary deposit, was as safe as it would have been if carried into tbe bouse, and tbe reasons for your opinion?
A. I think it was safer, because there was light from tbe room, which illuminated tbe front of tbe quarters, and tbe sentinel from tbe guard-house could see anybody approaching tbe baggage, and tbe officers standing with and near me could, see it. Then there were no locks on tbe bouse, and if tbe baggage bad been deposited in tbe bouse persons could have gone in from tbe rear without being seen. I do not know bow long tbe petitioner was absent in Eekerson’s quarters 5 be was not absent from ine more than half an hour.
Directly after reaching tbe fort petitioner accompanied one of tbe officers to bis quarters to obtain something to eat; tbe necessity for this is made apparent by tbe evidence of Colonel Marshall. Petitioner was absent for about half an hour to procure supper 5 during this time tbe robbery was perpetrated.
Tbe thieves were a sergeant and five others of tbe garrison. Tbe robbery was probably planned in advance, and was so skillfully carried out, that- isolated as tbe fort was, and notwithstanding tbe efforts made by those in tbe garrison, officers and others, to detect it, tbe robbers succeeded in getting off with tbe money. Tbe thieves became deserters. ' Tbe box in which tbe money was when stolen was not found for some few days, and when found, bad some of tbe contents, postal money, in or about it.
Tbe petitioner made every possible exertion to recover tbe money and arrest tbe thieves.
In this respect bis conduct is worthy of commendation.
There was recovered from tbe thieves, who bad fled in different directions, tbe sum of $41,638 32, out of which was paid for rewards, fees of officers of justice, and other necessary expenses, tbe sum of $4,068, leaving as loss tbe sum of $25,456 80.
Tbe money expended for recovering that which bad been *510 stolen was judiciously expended, and tlie propriety of the expenditure is justified by its results. We cannot say that this loss should fall upon the petitioner. The benefits to the government in capturing the thieves and deserters, six in number, by showing to soldiers in garrisons the difficulty of escaping detection for crimes committed, and the certainty of punishment, will well compensate the loss of this disbursement. The conduct of petitioner was approved by his superior officers, not only in his own line of duty, but of all others with whom he was in any way connected, or to whom the facts were made known.
Major General Halleck, Brevet Major General Steele, and the deputy paymaster general of the military division of the Pacific, all concurred in commending the petitioner to the favorable consideration of the War Department. There is a concurrence of opinion among the officers, that petitioner was more careful than paymasters generally are, in the keeping and preservation of his funds.
The Assistant Attorney General insists that the Act of May 9, 1866, (14 Stat. L., p. 44,) giving jurisdiction in cases like this, to the Court of Claims, is not prospective in its operation, but limits the power to give relief, to losses which had occurred anterior to its passage.
The act says, the Court of Claims “ shall have jurisdiction to hear and determine the claim of any paymaster * * * for relief from responsibility on account of- losses, by capture or otherwise, while in the line of his duty, of government funds, vouchers, records, and papers in his charge, and for which such officer was and is held-responsible.”
We do not find in these words “was and is,” a direction to the court to confine its jurisdiction to losses which had previously occurred. The statute in question is of a remedial character. A disbursing officer is quite as likely to lose public money otherwise than by capture, as well in peace as in war, and may as well be entitled to relief where he is without fault or neglect, as if war actually existed. There is no such doubtful meaning of the words used, as to authorize us to indulge in conjecture as to the intention of Congress. The meaning seems to be plain, that the act was designed to be prospective, and to give relief where losses might occur, as well as where they had occurred, there not being any expression or command other *511 wise, and we must carry tbe act into effect and apply it to sucb cases. Tbe loss is a loss, whenever it occurs, tbe consequences to tbe officer are tbe same, and tbe relief is as important and proper at one time as another. The word “ capture” is not a controlling word in tbe statute, and does not, nor was it intended to, confine relief to cases which occurred before tbe law was passed.
Under tbe proofs and circumstances exhibited by this record, we think tbe claimant should have a decree entitling him to a credit with tbe proper accounting officers of tbe treasury in tbe settlement of bis accounts for tbe sum of $25,456 80, and it is o ordered.