Booth, J.,
delivered the opinion of the court:
This is' a claim for relief under sections 1059 and 1062, Revised Statutes.
Section 1059, Revised Statutes, pages 195, 196, reads as follows:
“ The Court of Claims shall have jurisdiction to hear and determine the following matters * * * :
“ Third. The claim of any paymaster, quartermaster, commissary of subsistence, or other disbursing officer of the United States, or of his administrators or executors, for relief from responsibility on account of capture or otherwise while in the line of his duty, of Government funds, vouchers, records, or papérs in his charge, and for which such officer was and is held responsible.”
Section 1062, Revised Statutes, page 196, provides as follows:
“ Whenever the Court of Claims ascertains the facts of any loss by any paymaster, quartermaster, commissary of subsistence, or other disbursing officer, in the cases hereinbefore provided, to have been without fault or negligence on the *421 part of such officer, it shall make a decree setting forth the amount thereof, and upon such decree the proper accounting officers of the Treasury shall allow to such officer the amounts so decreed, as a credit in the settlement of his accounts.”
The claimant, J ohn J. A. Clark, was first lieutenant in the Philippine Scouts. On January 8, 1905, claimant with his company arrived at Santo Tomas, P. I., to take station at said place and relieve Lieut. John J. Ryan, Twelfth Cavalry, and-Second Lieut. George B. Hunter, as quartermaster, who were ordered elsewhere with troops upon claimant’s arrival. The facts given in detail in the findings show that claimant upon the date of his arrival counted the funds in the custody of Lieut. Hunter, receipted for them, and continued in force the same precautions and the same system of guarding their possession and safety employed by his predecessor. The funds of the quartermaster were kept in an iron safe furnished by the United States for that purpose; the safe possessed a combination lock, and because of its comparatively small size was secured to a permanent post in the room of the quartermaster sergeant by a strong chain. The post quartermaster sergeant was especially detailed to guard the safe, sleep in the same room, was armed for protection, and instructed under no circumstances to leave it unguarded either day or night.
The building occupied by the Quartermaster’s Department was centrally located, and the room in which the safe was kept was on the second story of the building and not of easy access from other parts of the same. On the night of claimant’s arrival three civilian employees of the Quartermaster’s Department formulated a conspiracy to steal the safe and contents. The quartermaster sergeant had left his post of duty and was drinking whisky in the house of one Scholtz. Allen, one of the thieves, knew of this fact, and in pursuance of their preconcerted plan he procured more liquor, visited the Scholtz house, induced the sergeant to drink intemperately, and by the use of drugs brought him into a state of helpless stupor, thus preventing his return to duty. The two other conspirators during this time forcibly entered a blacksmith’s shop, procured the necessary tools, and after breaking and entering the Quartermaster’s Department, *422 secured entrance to the sergeant’s room, tore the safe from its fastenings, and carried it from the building. The thieves carried their booty to a neighboring grove of trees, and after the failure of repeated attempts to open the safe, abandoned it with its contents. The safe and contents were never recovered. The claimant and Lieut. Hunter, with whom he spent the night, discovered the robbery about 6 o’clock the following morning. The quartermaster sergeant left in charge of the safe had always been found to be reliable and competent; the claimant had known him for some months. Lieut. Hunter had attested to his trustworthiness, and in addition thereto he had a good record of many years’ service in the Army.
The relief granted under the foregoing statute extends only to the class of cases where the claimant has established by a clear preponderance of the evidence that he was without fault or neglect in the care and custody of public funds. The law imposes upon the court the judicial responsibility of exacting from claimant such a degree of proof as will clearly exempt him from loss, where the circumstances attending the same not only indicate his innocence in the premises, but clearly establish the employment of such precautionary measures as to exclude the idea of fault or negligence. The manner of the loss is a circumstance no more; it may tend to excuse, and it may tend to aggravate. Theft and robbery is always a menace; it is difficult to circumvent. A public ■ officer in charge of public funds must anticipate its possible happening, and when he has done so in such a manner as a prudent and cautious man would do under similar circumstances, he can not be charged with fault and neglect. (Glenn v. United States, 4 C. Cls. R., 501.)
In the case of Boggs v. United States (44 C. Cls. R., 367) this court in an exhaustive opinion reviewed the authorities upon this subject and announced rules for future procedure under the statutes. In that case the court said, speaking of the laws:
“ They were passed to relieve innocent disbursing officers from the rigors of the law, and the consequent judgment of. courts of law, by allowing them to go into a court of equity, and, by establishing the fact that they were faultless, obtain *423 a c decree ’ which would require the accounting officers to allow to such officer credit in the settlement of his accounts. The provisions in question are predicated upon the act of 1866, which did not lessen the legal liability of disbursing officers nor give them generally greater legal rights than they possessed. The Court of Claims alone acting as a court of equity can administer the equitable provisions under which relief is here asked and award the specific redress authorized by the statute in and only in exceptional cases. That is, where the officer has established the fact that his conduct has really been faultless. Before relief can be granted it must appear with reasonable degree of certainty from all the proof and circumstances of the case that the officer intrusted with public money has exercised watchfulness over the funds and such degree of care as fairly and equitably entitle him to a decree exonerating him from the obligation of his bond.”
It is quite apparent that the solution of each case depends upon the circumstances and conditions under which the loss occurred, and that the court can not establish any general rule declaring what acts upon the part of the claimant will exempt from liability.
The claimant arrived at Santo Tomas at about 3 o’clock in the afternoon of January 8, 1905; he proceeded with all possible dispatch to transact his military duties; the time between his arrival and nightfall was but a few hours, and it would have been impossible for him to have materially changed the existing order of things as respects the guardianship of public funds. Claimant, however, seems to have taken nothing for granted; he personally inspected the safe containing the funds, the room and building where it was kept, the manner of its security, changed the combination of the lock, and continued the sergeant as a watchman. His instructions to the sergeant were strict and imperative. The robbery occurred within a short time after his arrival, and there is nothing in the record to indicate that the claimant had any just or reasonable grounds to suspect that the sergeant was susceptible to the influences which subsequently caused the loss of the safe and contents. On the contrary, the record of the sergeant, his personal acquaintance with him, supplemented by the commendatory remarks of claimant’s predecessor, warranted his retention as the special *424 watchman of the funds. ' Considering the circumstances and the amount involved, we think the precautionary measures were sufficient to bring the case within the statute.
The claimant is entitled to a decree for a credit with the proper accounting officers of the Treasury in the settlement of his accounts for the sum of $649.07. It is so ordered.