Howell, Judge,
delivered the opinion of the court:
This suit is brought under the special provisions of Sections 145 and 147 of the Judicial Code conferring jurisdiction on this Court to grant relief from liability to Disbursing Officers of the United States, which provide as follows:
SeotioN 145. Jurisdiction. — The Court of Claims shall have jurisdiction to hear and determine the following matters:
*541 (3) Disbursing Officers. — The claim of any paymaster, quartermaster, commissary of subsistence or other disbursing officer of the United States, or of his administrators or executors, for relief from responsibility on account of loss by capture or otherwise, while in the line of his duty, of Government funds, vouchers, records, or papers in his charge, and for which such officer was and is held responsible.
Section 147. Decree on Acts of Disbursing Officers.— Whenever the Court of Claims ascertains the facts or any loss by any paymaster, quartermaster, commissary of subsistence, or other disbursing officer, in the cases hereinbefore provided, to have been without fault or negligence on the part of such officer, it shall make a decree setting forth the amount thereof, and upon such decree the General Accounting Office shall allow to such officer the amount so decreed as a credit in the settlement of his accounts.
The plaintiff, Deane A. Libby, during the entire period here involved, was a commissioned officer on active duty in the Army Air Corps as a pilot, and was engaged in ferrying aircraft to overseas destinations. During World War II cash was made available for emergency expenditures outside the continental limits of the United States to aircraft crews ferrying aircraft to overseas destinations. These funds were needed for the purpose of buying gasoline, feeding crews, paying per diem to the crews, and for such emergency expenditures as might arise in order to provide for the safety of the ferrying crews and the aircraft. In order to carry out this purpose, a member of each ferrying crew was designated as a Class “B” finance officer and Government funds in cash were entrusted to the agent so appointed to be used for making emergency disbursements when outside the continental limits of the United States.
The overseas departure bases for aircraft for the Caribbean Wing of the Air Transport Command were located at Morrison Field (Palm Beach), Homestead and Miami, Florida, all of which were under the same command. Pilots and aircraft crews assigned to ferrying aircraft to overseas destinations were kept in a ferrying pool at Memphis, Tennessee, in the Fourth Ferrying Group. When aircraft was to be ferried overseas, Operations Orders were issued at *542 Memphis designating Air Corps personnel to a specific mission to be performed, in which orders the destination of the aircraft was left blank for security purposes. On the basis of these Operations Orders issued at Memphis, the personnel assigned to a mission under an Operations Order would pick up the designated aircraft at Savannah and then proceed to either Morrison Field at Palm Beach, Homestead or Miami for final orders and preparation for departure overseas. At Morrison Field, the Operations Orders issued at Memphis were presented and, on the basis of the Memphis orders, new Operations Orders classified as secret were cut at Morrison Field, in which the delivery destination of the aircraft was set forth. At this stage of departure, the crews were briefed for their overseas trip, detailed instructions were given, and all necessary equipment for the trip was issued.
On February 6,1943, Operations Orders were issued from the Headquarters of the Fourth Ferrying Group of the Air Transport Command at Memphis, Tennessee, in which the plaintiff was designated as a pilot to ferry an A-20 bomber to an unnamed overseas destination. These Operations Orders were amended by Operations Orders Nos. 40 and 47 dated February 9 and February 16, 1943. The Operations Orders issued from the Fourth Ferrying Group at Memphis omitted the overseas destination for security purposes. The Operations Orders issued at Memphis were presented to the Operations Office at Morrison Field where new Operations Orders were cut based upon the Memphis Operations Orders and the destination of the aircraft was inserted at Morrison Field immediately prior to briefing departure.
In order to carry out Operations Order No. 37, as amended by Operations Orders Nos. 40 and 47, the plaintiff was, on February 11, 1943, appointed a Class “B” Finance Officer for Captain Howard H. Simon, Finance Officer at Morrison Field for the purpose of securing $1,000.00 for making disbursements in connection with the carrying out of special missions.
At the time such funds were entrusted to such Class “B” finance officers, it was the custom of the Finance Officer at Morrison Field to issue a set of mimeographed instructions to all pilots and officers who were designated as Class “B” finance *543 officers. These instructions related to such items as use of public funds, rules governing per diem payments, preparation of vouchers, commercial purchases, and regulations for making settlement. In addition to written instructions, personnel of the Finance Office also gave verbal instructions both to groups and individuals designated as class “B” finance officers. These verbal instructions dealt in general with the fact that they were entrusted with public funds, the type of payments they could make, and the preparation of vouchers. Instances regarding loss of funds were sometimes included in the talks and an opportunity was given to the agent officers to ask questions.
There is not only no evidence that plaintiff was given instructions either oral or written as to the manner of guarding or how to keep funds entrusted to him as a Class “B” finance officer, but there is evidence to the effect that he was not given such instructions. Captain Howard H. Simon (Finance Officer who issued money to plaintiff) testified before the Board of Officers convened at Morrison Field on October 27, 1943, that, “There are no specific instructions relative to the safeguarding of money entrusted to agent officers. * * * We cannot tell how to keep the money because of the many difficulties involved in their different trips.”
On or about February 19, 1943, plaintiff departed from the continental United States for the purpose of delivering an A-20 bomber, the mission set forth in Operations Order No. 37, as amended by Operations Orders Nos. 40 and 47. While on this mission, the aircraft crashed at Castle Islands in the Bahamas, British West Indies, when about an hour and a half out of Morrison Field.
Plaintiff returned to the continental United States on or about February 25, 1943. From February 25, 1943, until March 3, 1943, he was at Morrison Field, West Palm Beach, Florida, and at Homestead, Florida. On March 1, 1943, effective as of March 3, 1943, the plaintiff was granted sick leave for two weeks during which time he was at Palm Beach, Florida. He was ordered back to temporary duty at Homestead, Florida, on the 16th of March 1943, where he served on temporary duty between March 16,1943, and March 30, 1943. He then reported to Morrison Field, Florida, on *544 temporary duty until April 6,1943. He left Morrison Field, Florida, on April 6,1943, and arrived at Memphis, Tennessee, on April 7,1943.
On April 8, 1943, Operations Orders were issued to plaintiff for his next overseas assignment, and immediately thereafter plaintiff left the United States to ferry an aircraft to Cairo, Egypt. Plaintiff delivered his aircraft at Cairo on or about May 5,1943.
On the trip to Cairo the plaintiff carried the funds previously issued to him in his brief case. The money in the denominations issued was too bulky to be carried in a money belt. Some pilots made a practice of carrying such funds in brief cases or money bags. Others carried their funds in a canvas Army carrying kit large enough to carry toilet articles, clothing, and one day’s K ration, equipped with a two inch strap so that the bag could be either worn over the shoulder or carried on the back, commonly described as a musette bag.
En route to Cairo, plaintiff kept the brief case beside him in the cockpit and at overnight stops and at Cairo he kept it in his personal possession. While in the African theatre, en route to Cairo, plaintiff disbursed $127.50 from the funds to himself for per diem for the period from March 16 to April 7,1943, while he was in the continental United States. The plaintiff subsequently submitted a voucher for this amount, which was approved, thus leaving in the trust fund a balance of $872.50.
During the period here involved, Army aircraft crews engaged in ferrying aircraft to overseas destinations returned to the United States as passengers on either Army transport planes or Army contract carriers. The latter were civilian aircraft contracted to the Army for military purposes, but operated by civilian aircraft personnel. These planes were variously equipped for seating accommodations. Some had regular passenger seats, some had bucket seats, and some were equipped with planks for seats. Passengers had no place to sleep except in their seats or on the floor. The transport planes in which the plaintiff traveled from Cairo' to Natal, Brazil, were equipped with bucket seats and carried about 28 passengers plus the crew.
*545 On all planes tbe passengers were required to check all heavy baggage following the customary procedure of civilian aircraft. This baggage was locked in baggage compartments of the plane and was not accessible during flight. The passengers were permitted to take onto the plane with them light hand luggage such as shaving kits, brief cases, and musette bags.
On his return trip, plaintiff left Cairo, Egypt, a few days subsequent to May 5, 1943, in a transport plane and flew to Accra, British Gold Coast, where an overnight stop was made; from there he flew in a transport plane to Natal, Brazil, arriving at dawn about May 16. He left Natal at about 4 am. the next day, and flew on an Army contract carrier to Miami, Florida, arriving there shortly after May 17. During these three flights, intermediate stops were made for servicing the planes and providing meals for the passengers. A considerable portion of the flying time was at night.
The plaintiff put his brief case with the money in it in his parachute bag and prior to the flight checked the bag with the transport officer in Cairo for loading on the plane with other luggage. While on the plane, his parachute bag, as well as the baggage of the other passengers, was locked in the baggage compartment of the plane and was not accessible to him during the flight. The parachute bag was returned to him at Accra, where he again checked the bag for the flight to Natal, and it was returned to him there. He opened the bag at Natal to obtain certain maps, and at this point the money was in the brief case. Upon this both plaintiff and defendant are agreed.
Plaintiff again checked his parachute bag, with his brief case in it, as baggage at Natal prior to the flight. Upon arrival at the airport at Morrison Field, West Palm Beach, Florida, the parachute bag was missing. Plaintiff then went through the baggage compartments of the aircraft and checked over all the baggage that had been removed therefrom, but could not locate the missing parachute bag.
Plaintiff then reported the loss of the parachute bag to Captain Grout, the foreign operations officer at Morrison Field, and requested him to have all stations checked along the route. In August 1943 the bag was found in the ware *546 house at Morrison Field and plaintiff was notified. The money and personal records and clothing of plaintiff were missing. The money was never located.
The loss was reported to Captain Howard H. Simon, Finance Officer at Morrison Field to whom plaintiff was accountable, sometime prior to September 10, 1943. On September 10, 1943, the finance officer requested the Commanding Officer at Morrison Field to appoint a Board of Inquiry to investigate into and report upon the alleged loss of funds. This Board convened at Morrison Field on October 27,1943, and after hearing testimony, under oath, of the plaintiff and of Captain Howard H. Simon, the disbursing officer who issued the money to him, the board found that, “Captain Deane A. Libby acted as a reasonably prudent man and exercised reasonably sound judgment in the care and protection of the money entrusted to him as Class ‘B’ Agent finance officer.”
The Commanding Officer at Morrison Field transmitted the Board’s Report to the War Department with the statement that he did not concur in the findings or recommendations of the Board, and on July 20,1944, a Board of Officers was appointed at Washington, at the request of the Fiscal Director of the War Department, to review the findings of the Board of Officers convened at Morrison Field.
Upon receipt of the report of the Board appointed at Morrison Field and the Commanding Officer’s statement and recommendation in connection therewith, the Finance Department recommended that Lieutenant Libby be held pecuniarily responsible for loss of Government funds in the sum of $872.50, which finding and recommendation was approved by the Secretary of War. The full amount was repaid, under protest, by the plaintiff to the Finance Officer of the War Department.
This is the amount plaintiff seeks to recover and the sole question presented in this case is whether the plaintiff has established that the loss of Government funds entrusted to him as a Class “B” finance officer was without fault or negligence on his part in order to entitle him to be relieved of the responsibility for the loss thereof under the statutes here-inbefore referred to.
*547 The criteria for granting relief under the statute involved is stated by the court in its opinion in the case of Boggs v. United States, 44 C. Cls. 367:
Before relief can be granted it must appear with reasonable degree of certainty from all the proof and circumstances of the case that the officer entrusted with public money has exercised watchfulness over the funds and such degree of care as fairly and equitably entitle him to a decree exonerating him from the obligation of his bond.
* * * * ÍÜ
Cases have arisen from time to time in' this' Court where relief has sometimes been granted and sometimes refused. * * *
It is, we think, a sound proposition that the statutes [Sections 1059 and 1062 of the Revised Statutes, now Sections 145(3) and 147 of the Judicial Code] under which the court, on the petition of the plaintiff, has acquired jurisdiction were intended to give disbursing officers a greater right to relief than they already possessed before these acts were passed.
* * * the court cannot well undertake to formulate any general rule declaring what acts may carry exemption from liability. Each case must depend upon those conditions and circumstances which necessarily arise out of the proof when presented.
In the Boggs case, the claimant, a disbursing officer, sought relief from responsibility for loss of funds, but the court held that he was negligent in that he accepted cash from his predecessor without verifying the accuracy of the official cash book or the correctness of the balance transferred to him, and failed to verify the monthly statements, which enabled his clerk to show a false balance and embezzle funds amounting to $10,000.
The defendant argues that the facts in the case of Stevens v. United States, 41 C. Cls. 344, are apposite to the facts in the case at bar. There a disbursing officer with his clerk and messenger left his office in Atlanta, Georgia, for the railroad station, the messenger carrying the satchel containing $4,765.00. On the way to the train plaintiff and his clerk left the messenger who had the satchel containing the money in his possession while they went across the street to a cigar *548 stand, and when the plaintiff and his clerk returned to the station the messenger could not be found until the train had left. They later met him on the street, a later train was taken by them, but the satchel was not opened or examined by plaintiff until the next day when it was discovered that the money was gone.
The evidence in that case showed that when the claimant or his predecessor went out on pay trips it was the custom for the messenger to take the satchel with the money in it to the train, remaining “almost always” in sight of the paymaster, whose satchel with the money therein he was carrying. The court denied relief holding that it could not be held that the loss occurred without fault or negligence on the part of the plaintiff.
The defendant urges that in the case at bar plaintiff was not only guilty in one instance of negligence, but in two instances.
The first instance is urged on the basis of the fact that the plaintiff failed to make an accounting for a period of approximately forty days which elapsed between February 25, 1943, and the date upon which he returned from his first mission which resulted in the crash at Castle Islands in the Bahamas, British West Indies, and April 8,1943, when orders were issued for his next overseas assignment. Defendant urges that plaintiff’s action in failing to make an accounting during this period and in keeping possession of the $1,000 in cash was a violation of regulations and in itself constitutes negligence.
We fail to see any material bearing this fact has upon the present issue of negligence here involved. As a matter of fact, it might be argued that the Government itself was by the same token negligent for failing to ask for an accounting from plaintiff before the second mission was undertaken.
It is obvious that the Government was at all times aware of plaintiff’s identity and whereabouts and that he was the pilot of a very valuable plane which had crashed in the British West Indies. Whether any investigation or report was ever required of the plaintiff in connection with the loss of the plane does not appear from the evidence, but at any *549 rate, the plaintiff was shortly thereafter assigned to pilot another airplane overseas.
The second instance of negligence complained of by the defendant appears to us to be the only issue before us, i. e., whether or not the plaintiff was negligent in the manner in which he carried the money with him. As was stated in Glenn v. United States, 4 C. Cls. 501, 504:
All cases like this must be examined and considered by the light of surrounding circumstances. What might be exacted from a disbursing officer as prudential should have regard to his situation, necessities, and condition. What might excuse the conduct of a party at one time or place, would not do so under another state of facts. What caution or wariness might require at some times would not be necessary at others.
Witnesses at the trial in this case testified that in discussions with “maybe 100, 200” finance officers as to how they carried Government money entrusted to them, they found that they did not all carry the money in the same way. It would be difficult indeed to specify any particular manner in which these amounts of money should be carried under every type of situation or condition. Certain finance officers testified that the usual practice on trips similar to those undertaken by the plaintiff was to carry money in brief cases, money bags, or musette bags in such a way that the money could be kept in the possession and control of the officer at all times.
The type of plane in which the plaintiff traveled was equipped with bucket seats and carried approximately 28 passengers in addition to the crew, and most of the flying time was at night. The plaintiff was confronted with the decision as to whether he should carry the brief case with him into the plane for a long ride during the nighttime when most likely he would be sleeping a great portion of the time, or have it locked in the baggage compartment of the very plane in which he was riding and in which he expected to reach his destination. We find it extremely difficult to conclude that the plaintiff in making his choice exercised poor judgment or negligence of any kind. The manner in which he chose to carry the funds with him might by *550 some reasonably prudent individual have been considered the best and safest method under the circumstances.
While we are aware that this is a de novo proceeding under the statute and that under the decision in the case of Woog, Administrator v. United States, 48 C. Cls. 80, we are required to make an independent investigation to afford relief irrespective of the findings of any Board, we certainly are not precluded from taking notice of the fact that the first Board which was convened at Morrison Field on October 27, 1943, recommended that the plaintiff be relieved from the responsibility for the loss of the funds. This Board was composed of officers stationed at Morrison Field from which the overseas ferry operations began. These officers were familiar with all the details and usual practices involved in these finance operations, as well as with the personnel, and in general were peers of the plaintiff.
In view of all the circumstances and conditions in this case, we are of the opinion that the plaintiff did exercise that degree of care and diligence that would have been expected of a reasonably prudent and careful individual under the same or similar circumstances. This officer therefore acted without fault or negligence and should be relieved of responsibility for the loss of $872.50.
It is so ordered.
Madden, Judge; Wi-iitakee, Judge; Littleton, Judge; and Jones, Chief Judge, concur.